## SPROUT, WALDRON & CO. v. BAUER BROS. CO.

### No. 365.

District Court, S. D. Ohio, W. D.
Aug. 4, 1938.

Greer Marechal, of Dayton, Ohio, J. B. Hayward, of New York City, and Lawrence B. Biebel, of Marechal & Noe, all of Dayton, Ohio, for plaintiff.

Marston Allen and John Melville, of Allen & Allen, all of Cincinnati, Ohio, and Paul A. Staley, of Springfield, Ohio, for defendant.

NEVIN, District Judge.

This is a patent suit brought in the usual form. Plaintiff filed its bill of complaint in this court on September 24, 1934, alleging infringement by defendant of Manson patent No. 1,399,976, issued December 13, 1921. Plaintiff is the owner of the Manson patent having acquired title thereto by assignment. It prays for an injunction and an accounting.

In its answer, filed November 17, 1934, defendant denies infringement and alleges invalidity of the patent. It denies that the alleged inventions purported to be described in the letters patent are of any value or utility and denies that plaintiff has manufactured or sold any apparatus adapted for use in carrying out any process alleged to be covered by said letters patent. It denies that it has derived or will derive and receive any gains or profits from any alleged infringement, and alleges that all of the substantial and material parts of the alleged inventions of the letters patent were fully described and shown in certain letters patent set forth in the answer for more than two years prior to the application for the letters patent in suit.

Defendant further avers that in the prosecution of his application for the patent sued on Manson gave constructions to the claims of the patent that prevent plaintiff from applying the same to any structure made, used or sold by the defendant herein; that the claims of the patent are vague and that the process and apparatus described are inoperative to perform any useful function, and that they "are, therefore, void".

## The Manson Patent.

Manson patent No. 1,399,976 in suit is for "Method of Manufacturing Fiber Products". It is for a process or method of manufacturing a fiber product such as wood pulp. The process generally is of such character as to produce a wood pulp suitable particularly for the manufacture of fiber-board or "wall-board". Manson, the patentee, is a resident of Canada. He claims, in his patent, to have invented certain new and useful improvements in methods of manufacturing fiber products, stating, inter alia, that "This invention relates to improvements in methods of manufacturing fiber products, and it consists of a method of making uncooked or chemically untreated, loose, relatively long fibers from raw wood, together with a certain proportion of short fibers, such fibers being adapted to felt or mat together under pressure to form pulp articles or sheets. The process is designed to make use of what is now generally considered a waste material, namely, saw mill waste comprising slabs, edgings, short butting blocks, slats, burner refuse, sawdust, bark and shavings * * *". "In carrying out the process the saw mill waste is first chipped; it is then fed with water between the grinding surfaces of spaced grinding elements set a short distance apart and having relative movement to each other, being passed between such surfaces for a sufficient length of time to reduce it to a flexible, feltable fibrous material directly adaptable for the manufacture of pulp board * * *". "In practising the process I first comminute the raw wood by the use of an ordinary chipper to which it is fed by gravity and which produces chips of a size from five-eighths to three-quarters of an inch with the grain, and one-eighth to one-quarter of an inch across the grain. The wood is preferably in the form of saw mill waste including slabs, edgings, short butting blocks, slats, burner refuse, sawdust, bark and shavings. No water is added to the wood, as it ordinarily will be found to contain from forty-five to sixty per cent. of water, but this may be as low as twenty-five per cent. if the material has been standing some time. The raw wood so comminuted is then passed between tapering grinding surfaces having but a narrow clearance between them, the clearance however being sufficiently wide to accommodate a plurality of fibers side by side. * * * From which it results that relatively long fiber bundles are produced, many of the fibers coming through in bundles with their ends free to interlock with other fibers when pressed. The grinding surfaces between which the comminuted wood is passed are not, in the present invention really the

comminuting means, their roughened surfaces being used more for the purposes of friction, to cause positive movement of the fibers. More reliance is placed on the mutual rubbing action of the wood particles on each other for producing the lateral separation of the fibrous elements from each other. * * *"

"In a way, my operation is more what may be termed a rolling separation of the fibers than a true grinding action. The purpose of adding the water to the mixture before passing into the grinder is to keep down the temperature and at the same time to make the mass fluid enough so that it will feed through the grinders. The wood is not steamed, soaked in water, treated with chemicals or otherwise chemically prepared in any way prior to my fiber making operation, it is raw wood which I use, wood which has not been changed otherwise than by the necessary comminution."

There was a great deal of argument throughout the case and in the briefs of counsel as to just what is meant in the patent by the term "raw" wood. This is dwelt on and emphasized because of the fact that Manson states in his patent (as above set forth), page 1, beginning on line 70, "No water is added to the wood, as it ordinarily will be found to contain from forty-five to sixty per cent. of water, but this may be as low as twenty-five per cent. if the material has been standing some time". Whereas, on p. 2, beginning on line 13, he says "The wood is not steamed, soaked in water, treated with chemicals or otherwise chemically prepared in any way prior to my fiber making operation, it is raw wood which I use, wood which has not been changed otherwise than by the necessary comminution".

From a reading of the whole text it seems apparent, however, that the Manson process was designed (as stated in the patent) to make use of what is generally considered as waste material from the saw mill which (as also stated in the patent) "ordinarily will be found to contain from forty-five to sixty per cent. of water"—which is water-soaked wood (see testimony of defendant's witness engineer Markley, Rec. p. 349)—and that this is the "raw" wood referred to on page 2 in line 16 of the patent and in the claims, such wood being "raw" wood as distinguished from wood that is "steamed, soaked in water, treated with chemicals or otherwise chemically prepared" prior to the fiber making operation. In other words, no additional operation by way of steaming or soaking in water or treating chemically is necessary under the process of the Manson patent. The waste material is taken as it is found to be with whatever water it contains which may be from forty-five to sixty per cent. or "as low as twenty-five per cent. if the material has been standing for some time."

It is unnecessary, however, to further discuss the contentions of the respective parties in this regard for the reason that Manson's invention resides not in the material operated upon but in the "manner" of operation.

### Validity.

The claims in suit are claims 1, 4 and 5, which relate to the underlying process of manufacturing wood pulp and claims 2 and 6 which relate to the extension of this process to the added steps for manufacturing wall board from this pulp.

Claims 1, 2 and 4, respectively, read as follows:

"1. The herein described process of manufacturing a fiber product which comprises, first chipping saw mill waste, then grinding the raw chipped wood with water between closely spaced surfaces having a movement relative to each other, such surfaces being sufficiently far apart to permit at the narrowest point the presence of a plurality of fiber bundles therebetween, whereby a rolling separation is affected."

"2. The herein described process of manufacturing a fiber product which comprises, first chipping raw wood, then grinding the raw chipped wood with water between closely spaced surfaces having a movement relative to each other, such surfaces being sufficiently far apart to permit at the narrowest point the presence of a plurality of fiber bundles therebetween, whereby a rolling separation is effected, then screening the fibrous material, then thickening the stock of the screening operation, and then pressing the fibers."

"4. The herein described process of manufacturing a fiber product which comprises first chipping raw wood, then grinding the chipped wood with water between closely spaced surfaces having a movement relative to each other, such surfaces being sufficiently far apart to permit at the narrowest point the presence of a plurality of fibers therebetween, whereby a rolling separation is effected."

On November 5, 1936, the parties herein entered into a stipulation which recites that "with particular reference to claims 2 and 6 of the patent in suit, (it is stipulated) that prior to Manson's invention the art was provided with standard centrifugal machines for the screening of pulp, that the art was provided with standard pulp thickeners, and that the art was provided with presses for the manufacture of board, and that according to prior practice it was old to first screen a fiber pulp, then thicken the stock of the screening operation, and then press the thickened stock to make a board."

Plaintiff concedes that it was not new in the grinding of wood into pulp to chip the wood into small pieces and grind the chipped wood in the presence of water nor was it new to provide grinding surfaces "having a movement relative to each other" but it claims that Manson's particular adjustment of the relative spacing of these surfaces,—that is, closely spaced surfaces, such surfaces being sufficiently far apart to permit at the narrowest point the presence of a plurality of fiber bundles therebetween whereby a rolling separation is effected, was Manson's novel contribution; that this particular adjustment for the spacing of the surfaces constituted Manson's important contribution to the art, and that thereby Manson was able to produce pulp with the desired long fibers and fiber bundles.

Plaintiff submits that the Manson process involved the adjustment and use of these grinding machines in a particular manner; that his novel features comprised operating the grinder with the surfaces at such a distance apart that at the narrow outlet there is sufficient space to permit the passage of the plurality of fiber bundles, this spacing also permitting the wood-against-wood action of the fibers rubbing against each other to effect the rolling separation, and thus first producing the long fibers by this rolling separation, and then preserving them intact at the narrow outlet.

This feature of relative adjustment allowing the "wood-against-wood" action is novel. It is not disclosed in any of the patents referred to and relied upon by defendant. That this is true, and that it was original with Mr. Manson is testified to by defendant's expert witness, Mr. Frank L. Walker, who stated (Rec. p. 323) " *  *  * Mr. Manson makes a point of the relative adjustment, having a space in there sufficient that the material will roll on itself rather than on the grinding surfaces.

"XQ15 And you don't find that disclosed in any of patents? A. No, sir; that seemed to be original with Mr. Manson."

As hereinbefore stated, Manson's invention resides not in the material operated upon but in the "manner" of operation which had for its distinguishing novelty the particular adjustment of the spacing between the surfaces, first effecting the rolling separation to produce the long fibers and fiber bundles, and then by the fiber-bundle spacing at the narrow outlet, permitting these fibre bundles to pass through intact.

The record shows that the Manson process was put into commercial operation using machines constructed and operated in accordance with the patent description. The court is of opinion that the patent in suit does show novelty, utility and inventive conception and that each and all of the claims in suit are valid.

### Infringement.

Defendant, the Bauer Brothers Company, is an Ohio corporation, having its principal place of business at Springfield, Ohio. It manufactures and sells a grinding machine known as the "Bauer", which plaintiff contends is so constructed as that when operated to treat wood pulp, the process claims of the Manson patent are infringed. It is conceded that since these claims are process claims, the mere manufacture of defendant's machines would not in itself prove infringement of the process claims, but plaintiff submits that if such machines are manufactured and then sold by defendant with the knowledge and intention that they are to be used in practicing the process covered by the Manson patent, this would be contributory infringement for which defendant would be responsible, and further that the testimony shows that defendant had established at their plant in Springfield, Ohio, a sales-demonstration laboratory operated on a commercial scale, and that in this laboratory defendant itself has actually practiced the process of the Manson patent as a commercial operation as an adjunct to selling defendants' machines, with the result that defendant is liable not only as a contributory infringer but as a direct infringer as well.

Plaintiff introduced as Exhibits No. 1 and No. 5, drawings of the Bauer machine, and also introduced as Exhibits Nos. 10 (and 10A), an article (and reprint) from the Paper Trade Journal, comprising a description of the features of the Bauer machine and its method of operation.

It was admitted by Mr. Bauer (Rec. pp. 97–99) that this article was prepared by the defendant, the exhibit-reprint was one of their own reprints of the magazine article, and that the information in the article is correct.

Defendant submits that "The lack of infringement is so clearly shown in this case by Plaintiff's own testimony that for the purpose of this hearing we may concede that Manson was the first to conceive the process described in his specification. We ask that the Bill be dismissed on the grounds that no infringement has been shown."

Before offering any evidence on behalf of defendant, counsel for defendant made a motion in the record (p. 257) "that the bill be dismissed on the ground that no infringement has been made out," that (Rec. p. 259) "it has not been proven that the defendant has contributed to the infringement of the Manson patent for the reason that each of the claims of the Manson patent call for grinding raw chipped wood, which is defined in the patent as wood which has not been changed otherwise than by the necessary comminution, excluding steamed wood and wood soaked in water; that the proofs show that in every instance the operation commercially of the Bauer machines is carried on with wood which is at least watersoaked and ordinarily cooked besides. And also on the ground that the claims call for the surfaces of the grinding members being spaced sufficiently far apart to permit at the narrowest point of the presence of a plurality of fiber bundles therebetween, and there has been no proof that such is the case in connection with the Bauer machines but, instead, the proof has been that the disks are run very close together and practically so much so that they become worn away by the work that they apply to the fiber. Those are the main grounds." It was agreed, however, that the trial should proceed and that the court should rule on this motion when deciding the case on the merits. The motion is now overruled, to which ruling defendant may have its exception.

Defendant urges that it has carried on all of its operations under Weiss Patent No. 1,711,706, issued May 7, 1929 (subsequent to the Manson Patent) and that the issues may be clearly understood by a comparison of that patent with the Manson Patent in suit, No. 1,399,976. Weiss Patent No. 1,711,706 is for a "Method of Making Wood Pulp". Weiss assigned the patent to the Bauer Brothers Company, defendant herein. In his patent, Weiss says (p. 1, lines 19 to 45, inclusive, and 91 to 99, inclusive) that "In my improved process I have found it possible to make wood pulp from waste materials in a more efficient and less expensive manner and with the production of pulp with longer fibers than by present methods. I accomplish this largely by using as one of the steps in the method the separation of the fibers by a crushing and rolling operation between rapidly rotating disks or plates of metal * * *. Briefly stated the method consists in, first comminuting or shredding the material by the use of hogs or shredders which reduces the material to a comminuted state in the form of chips, shreds or shavings; second; in soaking this material in water until it becomes thoroughly saturated; and, third, in crushing and rolling the materials under pressure in the presence of water between these high speed rotating disks whose peripheral edges are separated from each other by a distance equal only to a few thousandths of an inch or less. * * * These plates are set together under a strong spring pressure so that as the material is fed into the center and works its way outwardly between the disks it is subjected to a very high pressure and as the disks are rotating in opposite directions a rolling movement is imparted to the shreds or pieces of material which tends to crush and roll the fibers apart."

Defendant asserts that "the basic difference in the products resides in the fact that Manson is seeking to produce and claims to have produced by his method or process a new fibrous product, while Weiss by his improved method is producing a wood pulp such as has been produced by the prior art and has been in commercial use for many years."

Reference, however, to defendant's trade journal article in evidence discloses a detailed description of how the space adjusting mechanism is utilized and shows that defendant's process comprises the

steps of grinding so as to produce the fibers by the rolling action, that is to say, under the heading "The Essential Elements" (Ex. 10-A.) it is stated that "The essential elements of a Bauer consist of two 36-inch diameter discs facing and parallel with each other running at comparatively high speeds in opposite directions, sectional plates with a roughened surface being bolted to the face of each disc. Stock enters at the center of the disc and centrifugally moves towards the outer periphery during which period the fiber bundles are rolled, crushed and twisted, an action which separates the individual fibers with minimum reduction of fiber length. Action of the plates on the fiber bundles may be compared to the act of rolling a pencil between the palms of the hands, such a rolling action does not tend to cut fibers but rather to separate and to produce fibrillae which gives a felting action so desirable when the stock is run on the machine." And again (p. 2 of Ex. 10-A) it is stated "3—Space Between The Plates. The space between the plates is controllable by a temper screw which is graduated in thousands per inch. The closer the plates are set together, the greater is the refining action." The article also says "The Bauer is particularly well suited for the manufacture of insulation board due to its characteristic of maintaining fiber length."

As claimed by plaintiff, there is ample evidence in the record to show that defendant has appropriated the spacing feature of Manson's invention, that is—the fiber-bundle spacing at the narrow discharge opening to permit the presence therebetween of the fiber-bundles. This is shown, among other places, by the testimony of Mr. Markley, defendant's laboratory operator (Rec. p. 120 et seq.).

The court is of opinion that the operations by defendant in its laboratory at Springfield, Ohio, constituted direct infringement, and the sale by defendant of the Bauer machines to customers under the instructions and information as to the mode of operation of these machines constituted contributory infringement, by defendant of the claims in issue of Manson Patent No. 1,399,976 in suit.

Upon a consideration of all of the evidence and the arguments of counsel, the court has arrived at its findings of fact and conclusions of law. Inasmuch as they set forth the views of the court both upon the facts as shown by the record and the law as applicable thereto, the court deems it unnecessary to discuss further the claims of the respective parties or the relative merits thereof.

Upon the whole of the record, the court has arrived at the following:

### Findings of Fact.

1. Plaintiff, Sprout, Waldron & Company, is a corporation organized under the laws of the state of Pennsylvania, having its principal place of business at Muncy, Pennsylvania.

2. Plaintiff is the owner of all of the rights, title and interests in and to Letters Patent No. 1,399,976, issued to George James Manson of Toronto, Canada, on December 13, 1921, having acquired the same by proper assignment.

3. Defendant, the Bauer Brothers Company, is a corporation organized under the laws of the State of Ohio, and has its principal place of business at Springfield, Ohio.

4. The main features which characterize the practicing of the Manson process set forth in the Manson patent in suit are as follows:—

(a) Relatively rotating surfaces;

(b) Wide intake opening (for the passage of wood), tapered down to a narrow orifice at the discharge opening;

(c) Roughened surfaces that are wood-gripping to insure wood-against-wood grinding rather than of stone (or metal) against wood;

(d) "Rolling separation" thus effected to preserve the fiber length and not cut or destroy the fibers as in the old grinding machines;

(e) Fiber-bundle spacing of surfaces to "permit the presence of a plurality of fiber bundles", at the narrow discharge opening, to preserve the rolling and separation into long fibers.

5. The novel features of Manson's process comprise the relative adjustment, or spacing, of the two grinding surfaces to provide a space sufficient to cause the wood material to roll on itself rather than on the grinding surfaces and thus effect the "rolling separation of the fibers", and having the narrow peripheral or outlet opening sufficiently spaced to permit a passage of a plurality of fiber bundles, thereby preserving intact at the narrow outlet

the long fibers which were produced by the rolling separation.

6. No patent in the prior art discloses these novel features of the Manson process.

7. Manson put his process into commercial operation at Penetang, Ontario, using machines constructed and operated in accordance with the patent description. These commercial operations, from 1914 to 1917 produced a total of about five thousand tons of wall-board at a sales price of about $250,000. At that time Manson's wall-board was the only wall-board on the market except a beaver-board which was a laminated board made of several plies of thick pasteboard glued together. Manson's wall-board was made from sawmill waste, that is from slabs cut from logs floating in the river and containing 40 to 65% water. Manson also extended his commercial operations at Hawkesbury, Canada, from 1918 to 1928.

8. The Manson patent sets forth on page 1 the use of his process to treat "sawmill waste"; the specification states page 1, line 72, that this sawmill waste is "found to contain from 45 to 60% of water"; this shows definitely that Manson was operating upon water-soaked wood, as the testimony of defendant's engineer Markley establishes the fact that wood having this percentage of water must be water-soaked wood.

9. The later statement in Manson's specification, on page 2, lines 13 to 19, to the effect that the wood is not soaked in water, etc., while seemingly ambiguous or in conflict when compared with the preceding statement (on page 1 of the specification) that Manson's wood is soaked in water,—this later statement merely points out the particular advantage which his new process offers, that is, that Manson's process makes it unnecessary to give any additional treatment to the wood, such as steaming, or chemical cooking, or extra soaking in water. That is, Manson by this statement was illustrating the particular utility and advantages which flow from his process, whereby it was no longer necessary to pre-cook the wood, or steam it, or give it any additional soaking in water, —because, with his manner of operating, he could get the much desired long fibers, and fiber bundles, without being obliged to pre-cook or steam the wood or soak it in water.

10. Manson's patent (page 1, line 39 et seq.) refers to old and former processes of grinding wood and he differentiates therefrom, not on the basis that Manson confined himself to the treatment of non-water soaked wood, but on the basis of asserting that in his (Manson's) process he operated "in a different manner" from the former grinding processes.

That is, Manson states that in the former used method the wood was presented to the grinder face-on, under high pressure, which produced the undesirable short fiber; and that even when the wood chips were chemically treated or softened in water and then passed through this old form of "grinder" "this treatment" destroys the desirable characteristics of the fibers. That is, even though this wood were water-soaked, the trouble was with the old grinder. Thereupon Manson distinguishes his invention, by saying "I operate in a different manner" (Specification p. 1, line 55). Manson then proceeds in his specification to describe just what was his "different manner" or different method of operation, and not differentiating on the basis of using dry wood or non-water soaked wood: In fact, the sawmill waste which Manson then states that he uses in his new method included water-soaked wood, wood containing "from 45 to 60% of water."

11. The Patent Office file history of the patent in suit shows that Manson insisted that his process was patentable over the prior art on the ground of this difference in the "manner" of operation, and that one evidence of the fact that the prior art patents or machines operated in a different manner was the fact that the prior patentees could not operate on raw wood as Manson could, but were compelled, for their results, to pre-treat the wood by water-soaking or chemical cooking, whereas in Manson's process and manner of operation, such water-soaking was not necessary.

12. The file history of the Manson earlier filed application also shows that Manson distinguished his process from the prior art patents on the basis of his particular manner of grinding, and not upon the use of dry wood as distinguished from water-soaked wood.

13. Defendant at their laboratory in Springfield, Ohio, within this judicial district, carried out all of the steps of the process of each of the Manson claims in suit, by the production in their laboratory

of wood pulp and of wall-board. This work was done for clients of defendant who paid for the work and the operation of these machines by defendant was on a commercial basis for profit.

14. Customers of defendant purchased defendant's Bauer machines and operated them in accordance with instructions received from the Bauer Company. The Bauer Company sold such machines intending and knowing that they were to be operated by such customers in accordance with said instructions, and such operation by the customers followed all of the steps of the claims of the Manson patent in suit.

### Conclusions of Law.

1. Each and every one of the Manson claims in suit, namely claims 1, 2, 4, 5 and 6 are valid and are not anticipated by the prior art.

2. Manson did not in his patent disclaim the use of water-soaked or water-softened wood.

3. Manson did not in his patent exclude from his invention the use of pre-treated wood by water-soaking or water-softening or chemical cooking.

4. The use of the term "raw wood" in Manson's claims does not limit the interpretation of those claims to dry wood or to wood which has been neither water-soaked nor water-softened nor chemically treated.

5. Manson in the file history of his application in suit, or in the earlier filed application, did not disclaim from his invention the use of water-soaked or water-softened wood.

6. No interpretation can properly be placed upon the language of the Manson claims in suit to enable defendant to escape the charge of infringement by the mere expedient of giving the chips of wood a preliminary treatment of water-soaking.

7. Manson's claim 4 differentiates from claim 1 by reciting "grinding the chipped wood" instead of reciting "grinding the raw chipped wood", therefore this claim is infringed irrespective of what may have been done to the raw wood as additional treatment, such as additional water-soaking.

8. Limitations in other claims of the Manson patent cannot be read into claim 4.

9. If Manson's claims are fairly susceptible of two constructions, that should be adopted which will secure to the patentee his actual invention rather than to adopt a construction fatal to the grant.

10. The claims of the Manson patent, not his specifications, measure the invention.

11. Manson may be required to describe what he conceives to be the best embodiment of his invention, but he is not limited to that.

12. Arguments by Manson's solicitors in the Patent Office in the process of prosecution of Manson's application, do not of themselves set up an estoppel with reference to the interpretation of the claims.

13. The operations by defendant in its laboratory at Springfield were not merely laboratory experiments, but were upon commercial machines operated for profit on a commercial basis, and constituted direct infringement of the Manson claims in suit. The defendant cannot escape on the ground of experimental use where the machines were used to operate upon customers' products in the ordinary course of business.

14. Defendant is bound by the statements made by it in the article in the Paper Trade Journal prepared by defendant and introduced by plaintiff as Exhibits 10 and 10-a; and these statements must be taken as determinative against defendant on the question of the operation of defendant's machine and the process practiced by it, in deciding the question of infringement.

15. Defendant's sale of the Bauer machines to customers under the instructions and information as to the mode of operation of these machines constituted contributory infringement by defendant. The manufacture or sale of such appliances organized into a unitary device for practicing Manson's patented method, constitutes contributory infringement.

16. Plaintiff is entitled to an injunction and an accounting as prayed for.

Decree accordingly.